162 A.3d 1093

KEYKO GIL, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR THE INFANT KENNETH GIL, PLAINTIFFS–APPELLANTS, v. CLARA MAASS MEDICAL CENTER, DEFENDANT–RESPONDENT, AND HUSEYIN COPUR, M.D., AND FIRSTCHOICE OB-GYN LLC, DEFENDANTS, AND EXECUTIVE RISK SPECIALTY INSURANCE COMPANY; LEXINGTON INSURANCE COMPANY; ENDURANCE SPECIALTY INSURANCE COMPANY, LTD; FIRST SPECIALTY INSURANCE COMPANY; AND STEADFAST INSURANCE COMPANY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 6, 2016—Decided June 19, 2017

370

Before Judges Fisher, Ostrer and Vernoia (Judge Ostrer concurring).

*David A. Mazie* argued the cause for appellants (*Mazie Slater Katz & Freeman, LLC,* attorneys; *Mr. Mazie* and *David M. Estes,* on the brief).

*Lauren M. Strollo* argued the cause for respondent, Clara Maass Medical Center (*Vasios, Kelly & Strollo, P.A.,* attorneys; *Ms. Strollo,* of counsel; *Douglas M. Singleterry,* on the brief).

*Katherine E. Tammaro* argued the cause for respondent Executive Risk Specialty Insurance Company (*Tressler LLP,* attorneys; *Ms. Tammaro,* of counsel; *Ms. Tammaro* and *Kevin Sullivan,* on the brief).

*Michael J. Rossignol* argued the cause for respondents Lexington Insurance Company, Endurance Specialty Insurance, LTD., First Specialty Insurance Company and Steadfast Insurance Company (*Riker Danzig Scherer Hyland & Perretti LLP,* attorneys; *Mr. Rossignol,* of counsel and on the brief; *Brooks H. Leonard,* on the brief).[1]

*John T. Coyne* argued the cause for respondents Endurance Specialty Insurance, Ltd., and First Specialty Insurance Corporation (*McElroy, Deutsch, Mulvaney & Carpenter, LLP,* attorneys; *Mr. Coyne,* of counsel and on the brief).

*Kevin T. Coughlin* argued the cause for respondent Steadfast Insurance Company (*Coughlin Duffy, LLP,* attorneys; *Julia C. Talarick,* of counsel and on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

In this appeal, we examine clauses contained in insurance policies covering a hospital to determine, among other things, whether the trial judge erred in rejecting plaintiffs' arguments that an allegedly negligent physician was also covered because he was the hospital's "employee" or a "leased worker," or because his limited liability company was "affiliated or associated" with the

---

[1] These respondents, and those respondents whose appearances follow above, filed a joint brief. The brief's authors from each law firm are noted in their firm's separate appearances.

hospital. We conclude the policy language could not be plausibly interpreted to provide coverage to the physician or his limited liability company, and affirm.

I

In 2011, plaintiff Keyko Gil, on her own behalf and for her infant child, Kenneth, commenced this medical malpractice action against Huseyin Copur, M.D., FirstChoice OB/GYN LLC, and Clara Maass Medical Center, alleging that Kenneth's birth defects were caused by an emergency Caesarian section performed by Dr. Copur at Clara Maass in 2004. At the time of the procedure, Dr. Copur was purportedly acting in accordance with a services agreement between Clara Maass and FirstChoice; the latter was an entity formed by Dr. Copur and another physician.

By motion, the trial judge capped Clara Maass's exposure at $250,000, pursuant to the Charitable Immunities Act, *N.J.S.A.* 2A:53A–1 to –11, and denied without prejudice plaintiffs' motion to declare Dr. Copur an employee of Clara Maass. The judge, however, granted plaintiffs leave to file an amended complaint and later permitted another amendment by which plaintiffs sought relief on their own behalf, and as assignees of Dr. Copur and FirstChoice,[2] against defendant Executive Risk Specialty Insurance Company, which issued a policy to Saint Barnabas Health Care System[3] covering its "employees," and against defendants Lexington Insurance Company, Endurance Specialty Insurance, Ltd., First Specialty Insurance Company, and Steadfast Insurance Company, which provided excess insurance.[4] The trial judge later

---

[2] Dr. Copur and FirstChoice's insurer paid plaintiff its $1,000,000 policy limit "in exchange for any alleged rights under the subject policies and the agreement that plaintiff [would] not seek to execute on the assets" of Dr. Copur or FirstChoice beyond that policy limit.

[3] Clara Maass is part of the St. Barnabas system.

[4] Specifically, the primary coverage consisted of Clara Maass's self-insured retention of $1,000,000, followed by Executive Risk's policy, which provided

severed the coverage claims from the medical negligence claim, pending disposition of the former.[5]

Following the entry of summary judgment on the coverage issues in the insurers' favor, plaintiffs filed this appeal, posing issues about the interpretation of the relevant policies. Because summary judgment was entered, we employ the familiar *Brill*[6] standard which the trial judge was also required to apply. *See Townsend v. Pierre*, 221 *N.J.* 36, 59, 110 *A.*3d 52 (2015).

## II

In ascertaining whether the policies provided coverage for either Dr. Copur or FirstChoice or both, we first consider that the policies expressly covered "named insured[s]." FirstChoice and Dr. Copur, however, were not specifically listed in any of the policies as "named insureds."[7]

---

$7,000,000 in coverage, and Lexington's policy, which provided $25,000,000 in coverage. Excess coverage, which followed the form of Lexington's policy, consisted of: $25,000,000 provided by Endurance Specialty; $15,000,000 provided by First Specialty; $20,000,000 provided by Steadfast; and $15,000,000 provided by Executive Risk.

[5] Because there has been no final disposition of the malpractice claims, plaintiffs' appeal concerns only interlocutory orders and required our leave to appeal. *Grow Co. v. Chokshi*, 403 *N.J.Super.* 443, 457–61, 959 *A.*2d 252 (App. Div. 2008). We would have, however, likely granted leave to appeal in this situation had it been requested; consequently, we choose to exercise our discretion in favor of reviewing these interlocutory orders now rather than await final disposition of all issues in the trial court. *See General Motors Corp. v. City of Linden*, 279 *N.J.Super.* 449, 455–56, 653 *A.*2d 568 (App. Div. 1995), *rev'd on other grounds*, 143 *N.J.* 336, 671 *A.*2d 560, *cert. denied*, 519 *U.S.* 816, 117 *S.Ct.* 66, 136 *L.Ed.*2d 27 (1996).

[6] *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

[7] The list of named insureds also includes a "catch-all" provision that encompasses "any owned or controlled subsidiary, associated or affiliated company, corporation, partnership OR entity as now exists of may hereafter be constituted, acquired or formed."

The Executive Risk policy, however, also defined "insured" as including not only those expressly "named" but also "any [e]mployee or [v]olunteer." Since it has not been argued that Dr. Copur was a volunteer, we turn to that part of the policy that defined an "employee" as

> any person who has an assigned work schedule for and is on the regular payroll of the Named Insured, with federal and state taxes withheld. Independent contractors are not Employees. An Employee's status as an Insured shall be determined as of the date of the Occurrence or Wrongful Act upon which a Claim involving the Employee is based.

The Lexington policy—which was followed, as to its form, by the other excess insurers—also included coverage for Clara Maass's "employees" "but only for acts within the scope of their employment . . . or while performing duties related to the conduct of [Clara Maass's] business." The word "employee" is defined in that policy as "a person paid by [Clara Maass] in connection with [its] business." The word "employee" does not include "a temporary worker[8] or independent contractor,[9]" but does include "a leased worker," which was described as "a person leased to [the named insured] by a labor leasing firm, under an agreement between [the named insured] and the labor leasing firm, to perform duties related to the operations as described in the Declarations and which are at [the named insured's] direction."

## III

In granting summary judgment in favor of the insurers through his reading of the policy provisions quoted above, the trial judge rejected plaintiffs' arguments: (a) that Dr. Copur was an "employee," (b) that either Dr. Copur or FirstChoice fell within the terms of the "catch-all" provisions, or (c) that Dr. Copur was a "leased worker." We separately consider these arguments. But,

---

8 "[T]emporary worker" was defined as "a person who is furnished to [the named insured] to substitute for a permanent employee on leave or to meet seasonable or short-term work load requirements."

9 "[I]ndependent contractor" was not defined.

before that, we observe that although, as summary-judgment movants, the insurers were required to demonstrate the absence of a genuine dispute of all material facts, *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146, the ultimate burden of persuasion rested with plaintiffs, who stood in the shoes of Dr. Copur and FirstChoice on these issues,[10] to show the policies provided coverage. *See Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.,* 406 *N.J.Super.* 524, 538, 968 *A.*2d 724 (App. Div.), *certif. denied,* 200 *N.J.* 209, 976 *A.*2d 385 (2009); *Polarome Int'l, Inc. v. Greenwich Ins. Co.,* 404 *N.J.Super.* 241, 258, 961 *A.*2d 29 (App. Div. 2008), *certif. denied,* 199 *N.J.* 133, 970 *A.*2d 1050 (2009).

### A

■ The parties' debate goes so far as to question how we should determine whether Dr. Copur was an employee for purposes of the insurance policies in question. Plaintiffs invite us to look to common-law principles regarding what it means to be an employee or independent contractor. The insurers urge that we stick to the plain meaning of the words and phrases employed without straying into other areas where societal policies require an alternate view. In this circumstance, we agree with the insurers but will nevertheless discuss both approaches.

### (1)

The policies expressly defined an "employee" as a person who is paid by the named insured, here Clara Maass. The Executive Risk policy is very explicit in this regard, defining an employee within the meaning of that policy as "any person who has an assigned work schedule for and is on the regular payroll of the Named Insured, with federal and state taxes withheld." Dr. Copur testified at his deposition that he was not an employee, and it is undisputed that he was not on Clara Maass's "regular payroll."

---

[10] *Elat, Inc. v. Aetna Cas. & Sur. Co.,* 280 *N.J.Super.* 62, 67, 654 *A.*2d 503 (App. Div. 1995).

The other policies do not define the term "employee" by insisting upon that person being on the named insured's "regular payroll" but nevertheless require that the purported "employee" be "a person paid by [Clara Maass] in connection with [its] business." Again, there is no dispute that Dr. Copur was not paid by Clara Maass; FirstChoice was compensated by Clara Maass,[11] and Dr. Copur was paid by FirstChoice.

Undaunted, plaintiffs argue that even in the absence of evidence that Dr. Copur was paid by Clara Maass, other indicia of the relationship suggested that Dr. Copur was not an "independent contractor," which none of the policies defined. In other words, because "independent contractor" was not defined, plaintiffs argue that evidence tending to show Dr. Copur did not fit the common-law understanding of an "independent contractor" would, a fortiori, demonstrate his status as an "employee." We are not persuaded. Because the word "employee" is defined by reference to specific attributes and "independent contractor" is not defined at all, we reject plaintiffs' syllogism.

 General rules of interpretation require that, so long as it leads to a result in harmony with the contracting parties' overall objective, a specific, defined term controls a general, undefined term. *See Bauman v. Royal Indem. Co.*, 36 *N.J.* 12, 22, 174 *A.*2d 585 (1961); *George M. Brewster & Son, Inc. v. Catalytic Constr. Co.*, 17 *N.J.* 20, 35, 109 *A.*2d 805 (1954); *Burley v. Prudential Ins. Co.*, 251 *N.J.Super.* 493, 500, 598 *A.*2d 936 (App. Div. 1991). "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 *A.*2d 954, 961 (Del. 2005). "Even absent a true conflict, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which

---

[11] Plaintiffs have not argued that FirstChoice was an "employee" for purposes of any of these insurance policies.

the specific words or clause relate." 11 *Williston on Contracts* § 32.10, at 744 (4th ed. 2012).

Contrary to plaintiffs' contentions, we must first ascertain whether Dr. Copur meets the policy's specific definition of what it means to be an "employee" for purposes of insurance coverage. If he does not meet that definition, we may then conclude he was an independent contractor.[12] We should not, as plaintiffs argue, determine whether Dr. Copur is an independent contractor and, if not, conclude he must be an employee even if he does not possess the one attribute the contracting parties obviously viewed as controlling—whether he was paid by Clara Maass.

Moreover, we reject an even more basic premise to plaintiffs' argument—their contention that we must look to definitions of "employee" and "independent contractor" contained in the common law or as defined by or consonant with remedial legislation. We must not forget we are construing a contract created by sophisticated parties. The insurance policies in question do not remotely suggest that we should look to principles of law applicable to different circumstances as a means for ascertaining the meaning of the policies' terms. The contracting parties had a particular understanding that Clara Maass "employees" should be covered but that the attributes of an employee were specific and were not to be broadened by resort to common-law principles applied in other circumstances, particularly those principles and policies that call for a broad or liberal interpretation of the term. For example, the word "employee" has been defined broadly when determining whether an individual was entitled to the benefits of the workers' compensation statutes, the Conscientious Employee

---

[12] In short, an individual in this situation can fit only two categories—employee or independent contractor—and that if he fell within one he cannot fall within the other and vice versa. We recognize the policies suggest other possibilities, i.e., volunteer, temporary worker, and leased worker. But there is no dispute that Dr. Copur was not a volunteer or temporary worker, and we find no merit, as discussed later, in the argument that he was a leased worker. Consequently, we approach the immediate problem as questioning only whether Dr. Copur was an employee and, if not, he was an independent contractor.

Protection Act, *N.J.S.A.* 34:19–1 to –14, and the Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 12–3. *See Lippman v. Ethicon, Inc.*, 222 *N.J.* 362, 379, 119 *A.*3d 215 (2015); *D'Annunzio v. Prudential Ins. Co. of Am.*, 192 *N.J.* 110, 126–27, 927 *A.*2d 113 (2007); *Lowe v. Zarghami*, 158 *N.J.* 606, 617–18, 731 *A.*2d 14 (1999). In those instances, public policy and the remedial nature of the underlying social legislation "dictate[d] a more liberal standard." *Id.* at 618, 731 *A.*2d 14. Those same societal interests are not at play here.

In short, we decline the invitation to interpret the parties' expressions of what it means to be an "employee" for their purposes as if those insurance policies stated:

Your "employees" are covered, "independent contractors" are not; the terms "employee" and "independent contractor" are to be defined by and construed in accordance with New Jersey common law.

That is not a plausible interpretation of these policies.

(2)

Having rejected plaintiffs' proposed methodology for interpreting these policies, for the sake of completeness we examine plaintiffs' argument that Dr. Copur was not an independent contractor within the meaning of the common law. In their description of the common-law approach, plaintiffs correctly observe that our courts use "two different tests to distinguish employees from independent contractors," i.e., the "control test" and the "relative nature of work test." *Lowe, supra*, 158 *N.J.* at 615–16, 731 *A.*2d 14.

■■ The "control test" requires consideration of four factors: "(1) the degree of control exercised by the employer over the means of completing the work; (2) the source of the worker's compensation; (3) the source of the worker's equipment and resources; and (4) the employer's termination rights." *Id.* at 616, 731 *A.*2d 14. A worker's status as an employee can "often be solidly proved on the strength of one of the four items." *Tofani v. Lo Biondo Bros. Motor Express, Inc.*, 83 *N.J.Super.* 480, 486, 200 *A.*2d 493 (App. Div.), *aff'd o.b.*, 43 *N.J.* 494, 205 *A.*2d 736 (1964).

The Supreme Court described the relationship of the "control test" with the "relative nature of work test":

> If the court determines that a person is an employee under the control test, then the inquiry ends there. If, however, the control test is inconclusive, then the court must determine whether it is appropriate to apply the relative nature of the work test.
>
> [*Lowe, supra,* 158 *N.J.* at 618, 731 *A.*2d 14.]

The "relative nature of the work test" calls for an examination of "the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business." *Marcus v. Eastern Agricultural Ass'n,* 58 *N.J.Super.* 584, 603, 157 *A.*2d 3 (App. Div. 1959) (Conford, J.A.D., dissenting), *rev'g on dissent,* 32 *N.J.* 460, 161 *A.*2d 247 (1960); *see also Lowe, supra,* 158 *N.J.* at 616, 731 *A.*2d 14. When "the working relationship"—like here—"involves professional services where an employer cannot exercise control over the methods used to provide those services, the relative nature of the work test may provide a more accurate assessment of the working relationship." *Id.* at 618, 731 *A.*2d 14.

Application of the "control test" overwhelmingly precludes a finding that Dr. Coper was an employee. As we have already observed, Dr. Copur was not paid by Clara Maass, and Clara Maass had no control over Dr. Copur's efforts on behalf of the patient, even though FirstChoice's contractual arrangement with Clara Maass called for Dr. Copur's compliance with Clara Maass's bylaws and regulations.[13] And the use by Dr. Copur of any equipment provided by Clara Maass was purely incidental to his treating of patients. It may be true, in considering the test's fourth aspect, that Clara Maass was entitled to prevent Dr. Copur from practicing medicine in its facility, but, in the final analysis, the control test has no application to the relationship between Dr.

---

[13] As observed in *Lowe,* the fact that Clara Maass exercised control by rules applicable to "paperwork and other administrative procedures," does not mean Clara Maass did or could exercise "control over the way in which [Dr. Copur] operated on [a patient,] or [the selection of Dr. Copur's] choice of treatment." 158 *N.J.* at 619, 731 *A.*2d 14.

Copur and Clara Maass because his services on behalf of patients were not guided by Clara Maass but by the doctor's own knowledge, experience and judgment. As the Court recognized in *Lowe*, "it would be inconsistent with the nature of a physician's work for [the] employer to dictate the details of how [to] perform[ ] the practice of medicine ... [as] control is 'inimical to the task to be performed,' since the nature of the work depends upon the professional's independent exercise of judgment." 158 *N.J.* at 618–20, 731 *A.*2d 14 (quoting *Delbridge v. Office of Pub. Def.*, 238 *N.J.Super.* 288, 322, 569 *A.*2d 854 (Law Div. 1989)). Dr. Copur could not be viewed as an employee under the control test.

We also agree with the trial judge's rejection of the contention that the "relative nature of the work" test required a finding that Dr. Copur was a Clara Maass employee. To repeat, we emphasize there is nothing about the policy language that would suggest an intention to apply this common law test as the means for ascertaining whether a particular individual was covered by the policies. But, even if we were to conclude otherwise, we find the "relative nature of the work" test does not support an argument that Dr. Copur was a Clara Maass employee.

This test has been used either as the means for determining whether an individual is entitled to workers' compensation coverage or whether an individual should be deemed a public employee for TCA purposes. *Lowe, supra*, 158 *N.J.* at 617, 731 *A.*2d 14. For those purposes, the test considers both economic dependence and "whether the goals of the business are served by concluding that the particular worker is an employee." *Id.* at 622, 731 *A.*2d 14. *Lowe*, which considered the application of this test to a physician—but for the purpose of determining whether he was a public employee entitled to TCA immunities—nevertheless found the physician to be an employee because he was "totally economically dependent on UMDNJ and his work constituted an integral part of UMDNJ's business." *Id.* at 623, 731 *A.*2d 14.

The record does not reveal the same degree of economic dependence here as in *Lowe*. First, as we have repeatedly mentioned,

Clara Maass did not pay Dr. Copur. In addition, Dr. Copur and FirstChoice did not have offices at Clara Maass. And Dr. Copur and FirstChoice could and did engage in the practice of medicine outside the aegis of Clara Maass; in that regard, Dr. Copur testified at a deposition that he had privileges at Hackensack Hospital. Application of the second aspect of this test—"the relationship of the nature of [the alleged employee's] work to the operation of that business," *id.* at 616, 731 *A.*2d 14—considers whether the alleged employer's business goals would be promoted by the individual's status as an employee. *Id.* at 622–23, 731 *A.*2d 14. Plaintiffs' claim that this test applied here is belied by the fact that the agreement between Clara Maass and FirstChoice did not require the former to provide professional liability insurance for the latter. And Clara Maass' business goal included a reduction of malpractice exposure, the reduction of insurance costs, and an avoidance of depletion of its self-insurance fund. Dr. Copur was, in essence, a "house" physician [14] for Clara Maass' clinic, which offered services to patients of limited means. Increasing the costs of these services through a finding that Dr. Copur, or other physicians similarly situated, are entitled to be treated, for insurance purposes, as Clara Maass employees would likely increase the costs associated with operating the clinic.

For all these reasons, we reject plaintiffs' argument that Dr. Copur was a Clara Maass employee.

### B

■ Plaintiffs also argue that FirstChoice falls within the so-called "catch-all" provision. We, again, disagree.

This argument centers around provisions in the Executive Risk and Lexington policies that incorporate a list of "named insureds" which, along with those specifically named, includes coverage for:

[a]ny owned or controlled subsidiary, associated or affiliated company, corporation, partnership or entity as now exists OR who may hereafter be constituted, acquired or formed.

---

[14] In essence, being "available for emergencies."

Plaintiffs argue that this provision is ambiguous—that it is susceptible to more than one plausible interpretation, *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 *N.J.* 231, 238, 948 *A.*2d 1285 (2008)—chiefly because, according to plaintiffs, individuals involved in underwriting this policy "admitted that it is ambiguous." Plaintiffs also contend that, because the phrase "associated or affiliated company" is not defined in the policy, a question of fact is presented as to whether a particular entity is associated or affiliated with Clara Maass.

We reject plaintiffs' argument that "[t]he underwriter who approved the catch-all provision admitted that it is ambiguous." In this regard, plaintiffs mainly rely on the underwriter's deposition testimony where she expressed that she "did not completely understand at the time—what they were intending." We don't agree that this or any of her other testimony constituted an admission that the catch-all phrase was ambiguous. Instead, the deposition testimony—to the extent the underwriter's personal view of the policy's meaning has relevance—reveals that the catch-all provision did have for her a clear purpose, i.e., to incorporate as a named insured any entity that might have been omitted from the list of numerous entities that the principal named insured wanted covered. As the underwriter explained, the named insured basically presented a list of those entities then insured and sought inclusion of language in the policy that would provide coverage for any entity "inadvertently left off" the list; in short, the underwriter described the catch-all provision as "a belt and suspenders" provision.

To be sure, the underwriter's description of what was intended is not entirely clear. But her testimony does not support plaintiffs' declaration that the underwriter "admitted" the phrase is "ambiguous." Even viewed expansively, we consider this deposition testimony as revealing only an intent to include those entities on a list of organizations and other similar organizations that might have been overlooked or might come into being during the coverage period.

Moreover, any uncertainties expressed by the underwriter or others cannot convert the plain ordinary meaning of the policies' words and phrases into something doubtful and ambiguous. In interpreting insurance policies, we give words and phrases their ordinary meaning. *Zacarias v. Allstate Ins. Co.*, 168 *N.J.* 590, 595, 775 *A.*2d 1262 (2001). In seeking relief, it is noteworthy that plaintiffs do not provide what they believe is another plausible interpretation but, instead, suggest only the presence of a genuine factual dispute about the catch-all provision's scope because its terms are undefined. The lack of a definition, however, does not, as plaintiffs argue, "automatically" create an ambiguity. *Priest v. Roncone*, 370 *N.J.Super.* 537, 544, 851 *A.*2d 751 (App. Div. 2004); *see, e.g., Boddy v. Cigna Prop. & Cas. Cos.*, 334 *N.J.Super.* 649, 656–57, 760 *A.*2d 823 (App. Div. 2000).

Despite plaintiffs' failure to suggest a plausible interpretation that might be applied to create coverage for FirstChoice under the policies, we nevertheless examine the catch-all provision in search of ambiguity.

We start with the fact that plaintiffs do not, because they cannot, dispute that FirstChoice does not fit much of the descriptive words contained in the catch-all phrase; FirstChoice was not an "owned or controlled subsidiary" of Clara Maass, and it was not later "constituted, acquired or formed."

We also agree with the insurers that FirstChoice was not an "associated or affiliated company." The latter part of this phrase— "affiliated company"—has no application because that phrase is ordinarily understood as conveying some degree of ownership or control by the insured over the so-called "affiliated company." That is, an "affiliate" is understood to be a "corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Black's Law Dictionary* 69 (10th ed. 2014).[15]

---

[15] We recognize this edition of *Black's Law Dictionary* was published after the policies were formed. Earlier editions in existence at that time, however, also

■ Although of less certain meaning, the phrase "associated company" should be understood as connoting something similar to "affiliated company" pursuant to our familiar interpretive guides. For example, it is well understood that "the meaning of words may be indicated and controlled by those with which they are associated." *Germann v. Matriss*, 55 *N.J.* 193, 220, 260 *A.2d* 825 (1970); *see also Shelton v. Restaurant.com, Inc.*, 214 *N.J.* 419, 440, 70 *A.3d* 544 (2013). As particularly relevant in the insurance world—where scriveners often use series of similar words and phrases as the means of reaching or ensuring a particular goal— "words of a feather flock together." Consequently, we reject the contention that the phrase "associated company" may be given a far greater scope than its neighboring phrases—"owned or controlled subsidiary," and "affiliated company"—were intended to encompass. In short, we find implausible an interpretation that the catch-all provision was meant to include an entity having no relation other than the fact that it entered into an arms-length contract with a named insured. Were we to interpret the provision as broadly as plaintiffs would suggest, the policy would conceivably include coverage for entities that provide janitorial services or garbage removal to the named insureds. As a result, we conclude that the phrase "associated company" requires some ownership link between the named insured and the alleged "associated company." [16] Only in that way, could this term be harmonized with its neighboring words and phrases. Any other conclusion would be inconsistent with the words utilized by the parties in defining their rights and obligations.

---

insisted that an "affiliated company" be "related to another corporation by shareholding or other means of control," *Black's Law Dictionary* 59 (7th ed. 1999), or owned or "effectively controlled by another company," *Black's Law Dictionary* 58 (6th ed. 1990).

[16] Clara Maass refers to www.investopedia.com, where "associate company" is defined as an entity whose parent company "owns only a minority stake of the corporation, as opposed to a subsidiary company, where a majority stake is owned."

## C

██ Plaintiffs lastly contend that the policies cover Dr. Chopur because he was a "leased worker." We disagree with this as well.

We initially observe that the judge determined plaintiffs failed to comply with their discovery obligations, as required by *Rule* 4:17–7, by failing to identify this "leased worker" argument in response to interrogatories. Because we find no merit in the "leased worker" argument, we need not reach this discovery issue.

 The policy definition of "employee," as mentioned earlier, "includes a leased worker," which is defined as "a person leased to [the named insured] by a labor leasing firm, under an agreement between [the named insured] and the labor leasing firm, to perform duties related to the operations as described in the Declarations and which are at [the named insured's] direction." [17] Key to a determination of whether Dr. Copur was a "leased worker" is whether FirstChoice was a "labor leasing firm." As understood in this context, a "labor leasing firm" is

> a company in the business of placing its employees at client companies for varying lengths of time in exchange for a fee. In other words, a "labor leasing firm" is a business concern that sells another person's work for a specified time and for a specified fee.
>
> [*Telamon Corp. v. Charter Oak Fire Ins. Co.*, 850 *F.*3d 866, 870 (7th Cir. 2017) (quotations and citations omitted).]

This definition does not turn on how the agreement between the alleged lessor and lessee is labeled, i.e., the contract between Clara Maass and FirstChoice need not have been described by them as a "lease" in order to be encompassed. *Scottsdale Ins. Co. v. Torres*, 561 *F.*3d 74, 78 (1st Cir. 2009).

But the application of this provision does depend on whether FirstChoice was in the business of leasing its employees to others. The record amply demonstrates that FirstChoice was an entity by and through which its member physicians practiced medicine.

---

[17] We also previously observed that this definition expressly excludes "a temporary worker or independent contractor."

Although it provided physicians to perform certain services on Clara Maass's behalf for specific compensation, there is no evidence to suggest this was FirstChoice's sole or chief reason for existing. As the record reveals, FirstChoice had offices in Lyndhurst where its physicians saw and treated patients outside Clara Maass's auspices and control. And to the extent its agreement with Clara Maass might be assumed to be a leasing agreement, it has not been shown that FirstChoice had any similar agreements with any other entities. We, thus, reject the argument that FirstChoice is a labor leasing firm.

In addition, for there to be coverage, it is still not enough to determine that FirstChoice was a labor leasing firm. Plaintiffs were also required to show, as the provision demands, that the so-called "leased worker" performed services for the company to which he was leased "at [the named insured's] direction." Our earlier determination—that Dr. Copur did not meet the "control test"—leads us also to conclude that he did not perform services at the hospital at Clara Maass's direction; instead, he was chiefly guided by his own professional judgment in the rendering of treatment to the hospital's patients.

Dr. Copur could not be considered a "leased worker" within the meaning of the policies in question.

IV

We lastly note that plaintiffs have argued the judge erred in dismissing their estoppel claims. We find insufficient merit in that argument to warrant further discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

For all these reasons, we find no merit in plaintiffs' arguments that the insurance policies in question provide coverage for either Dr. Copur or FirstChoice.

Affirmed.

OSTRER, J.A.D., concurring.

I concur in the court's judgment and join in all but part III(A)(2) of its opinion. This is an insurance coverage case. The issue before the court is whether Dr. Copur was an insured under any of Clara Maass's policies. These policies covered employees, but not independent contractors off the payroll. So, the task turned to ascertaining whether Dr. Copur was an "employee."

Plaintiff made a fundamental error in contending the control test and relative nature of the work test inform the meaning of the policy term. As the court ably explains, plaintiff was looking for the definition of "employee" in the wrong place. The answer lies in the language of the insurance agreements, in particular, their definition of "employee." The parties to the policy were free to include, or not, a variety of persons who labor in the hospital. In this case, Dr. Copur and other independent contractors not on the payroll were left out. Thus, it is irrelevant whether Dr. Copur satisfied common law definitions of an employee, either by the control test or by the relative nature of the work test.

In a variety of legal settings, courts have grappled with whether a worker is an "employee." The answer affects workers' entitlements and companies' obligations under remedial social legislation and third-party rights to compensation. *See, e.g.*, *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 *U.S.* 440, 444–51, 123 *S.Ct.* 1673, 1677–81, 155 *L.Ed.*2d 615, 623–27 (2003) (applying the common law definition of employee in a case involving Americans with Disabilities Act where Congress did not expressly define the term); *Estate of Kotsovska ex rel. Kotsovska v. Liebman*, 221 *N.J.* 568, 116 *A.*3d 1 (2015) (adopting a "hybrid" approach for determining a worker's status under the Workers' Compensation Act); *Hargrove v. Sleepy's, LLC*, 220 *N.J.* 289, 106 *A.*3d 449 (2015) (concluding that an employee under the Wage Payment Law should be defined according to the so-called "ABC test" under *N.J.S.A.* 43:21–19(i)(6)); *Basil v. Wolf*, 193 *N.J.* 38, 63–66, 935 *A.*2d 1154 (2007) (utilizing a control test to determine that an insurer was not vicariously liable for the negligence of the physi-

cian it hired to examine a claimant); *Lowe v. Zarghami*, 158 *N.J.* 606, 614–24, 731 *A.*2d 14 (1999) (applying relative nature of the work test to determine that a physician under the circumstances was a public "employee" for purposes of the Tort Claims Act); *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*, 125 *N.J.* 567, 580–87, 593 *A.*2d 1177 (1991) (applying the "ABC test" to determine whether carpet installers' services constituted employment, making them eligible for unemployment compensation).

The analysis is context-specific. To determine whether a worker is an employee, a court must look to the specific statute's terms and purpose or the underlying goals of the common law doctrine. *See, e.g., D'Annunzio v. Prudential Ins. Co. of Am.*, 192 *N.J.* 110, 122 n.7, 927 *A.*2d 113 (2007) (stating that "in each setting-specific analysis, what matters most is that an individual's status be measured in the light of the purpose to be served by the applicable legislative program or social purpose to be served").

In this case, the court's analysis lacks essential context. Though the majority notes that its reasoning is dicta, I am concerned it may be misread to indicate that, putting the insurance coverage issue aside, Clara Maass should not be vicariously liable for Dr. Copur's actions because, according to the majority, it fails the control test and relative nature of work test. I am not so sure. For example, I cannot agree that an obstetric surgeon's use of a hospital's operating room is "purely incidental to his treating of patients." However, I will not analyze each of the factors that the majority considered, because my point is that we need not, and indeed should not, go there.

More broadly, I am wary of applying our traditional common law standards to increasingly complex and novel workplace relationships. Were Clara Maass's vicarious liability the issue, we would also likely consider whether it should be grounded on principles of apparent agency. *See, e.g., Estate of Cordero ex rel. Cordero v. Christ Hosp.*, 403 *N.J.Super.* 306, 312–18, 958 *A.*2d 101 (App. Div. 2008); *Arthur v. St. Peter's Hosp.*, 169 *N.J.Super.* 575, 581, 405 *A.*2d 443 (Law Div. 1979); *see also* Marjorie A. Shields,

Annotation, *Liability of Hospital or Sanitarium for Negligence of Independent Physician or Surgeon—Exception Where Physician Has Ostensible Agency or "Agency by Estoppel"*, 64 *A.L.R.*6th 249 (2017); *Restatement (Second) of Torts* § 429 (1965) ("One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.").

We might also consider whether the traditional control and relative nature of work tests should be modernized to account for the shift in the nature of workplace relationships in our society, which affects far more than the hospital or, more broadly, the health care sector. *See* U.S. Gov't Accountability Office, GAO–15–168R, *Contingent Workforce: Size, Characteristics, Earnings, and Benefits*, 4, 12 (2015) (available at http://www.gao.gov/assets/670 /669766.pdf) (most broadly defined, contingent workers—that is, "temporary, contract or other forms of non-standard employment arrangements in which they may not receive employer-provided retirement and health benefits, or have safeguards such a job-leave under the Family Medical Leave Act"—made up 35.3 percent of all employed workers in 2006 and 40.4 percent in 2010). No doubt, many workers desire independent contractor or other non-standard employment relationships. However, others are left with little choice but to accept them.

Over fifty years ago, Judge Conford recognized the limitations of the control test in workers compensation cases where "it is not in the nature of the work for the manner of its performance to be within the hiring party's direct control ...." *Marcus v. Eastern Agricultural Ass'n*, 58 *N.J.Super.* 584, 597, 157 *A.*2d 3 (App. Div. 1959) (Conford, J.A.D., dissenting), *rev'g on dissent*, 32 *N.J.* 460, 161 *A.*2d 247 (1960). The nature of work is changing. The advent of the so-called "gig economy," and the increasing use of "independent contractors," threaten to leave growing numbers of workers

unprotected by the remedial statutes designed to shield them from the vagaries of the workplace. *See* Miriam A. Cherry & Antonio Aloisi, *"Dependent Contractors" in the Gig Economy: A Comparative Approach*, 66 *Am. U. L. Rev.* 635 (2017); Orly Lobel, *The Gig Economy & The Future of Employment and Labor Law*, 51 *U.S.F. L. Rev.* 51, 61 (2017) (observing that, "in the Gig Economy, the distinction between independent contractor and employee continues to present definitional challenges and reveals the pervasive practical difficulty in applying" traditional, multi-factor tests). These new relationships also threaten to shield businesses from liability for the harm those workers caused while laboring on their behalf. Agnieszka A. McPeak, *Sharing Tort Liability in the New Sharing Economy*, 49 *Conn. L. Rev.* 171, 188–215 (2016) (describing how Uber and other companies in the "sharing economy" that rely almost entirely on independent contractors present challenges in the application of tort law). Scholars have suggested that our common law needs to adapt in other ways to assure compensation for wrongs committed by persons holding one of these new positions. *See, e.g., id.* at 215–25.

The traditional common law tests, as applied by the majority, may prove to be anachronistic. But that may be remedied. After all, "[o]ne of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court." *State v. Culver*, 23 *N.J.* 495, 505, 129 *A.2d* 715, *cert. denied*, 354 *U.S.* 925, 77 *S.Ct.* 1387, 1 *L.Ed.2d* 1441 (1957). "The common law has always had the inherent capacity to develop and adapt itself to current needs . . . ." *Collopy v. Newark Eye & Ear Infirmary*, 27 *N.J.* 29, 43–44, 141 *A.2d* 276 (1958); *see also White v. N. Bergen Twp.*, 77 *N.J.* 538, 551–52, 391 *A.2d* 911 (1978). Another court, facing this issue more squarely than our panel, should consider whether the present circumstances warrant such an adaptation.

As it is, this case does not require that we apply the traditional control test and relative nature of work test. Therefore, I would not.