**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0597-17T1

JAMES CARIFI,

      Plaintiff-Appellant,

v.

JAMES R. BARBERIO, JOHN P.
INGLESINO, ESQ., PAUL PHILIPPS,
AURORA INFORMATION
SECURITY & RISK, LLC,
TOWNSHIP OF PARSIPPANY-
TROY HILLS, THE LAW FIRM
OF INGLESINO, WEBSTER,
WYCISKALA & TAYLOR, LLC,
MATTHEW FERRANTE, and FIELDER,

      Defendants-Respondents.

_____

Argued February 12, 2020 – Decided December 14, 2020

Before Judges Hoffman and Currier.

On appeal from the Superior Court of New Jersey, Law
Division, Morris County, Docket No. L-3140-14.

Christopher L. Deininger argued the cause for appellant
(Deininger & Associates, LLP, attorneys; Christopher
L. Deininger, on the briefs).

Vijavant Pawar argued the cause for respondent James R. Barberio (Pawar Gilgallon & Rudy, LLC, attorneys; Vijavant Pawar, on the brief).

Thomas F. Quinn argued the cause for respondents John P. Inglesino and the Law Firm of Inglesino, Webster, Wyciskala & Taylor, LLC (Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, attorneys; Thomas F. Quinn and Joanna Piorek, of counsel and on the brief).

Timothy P. Beck argued the cause for respondent Paul Phillips (DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, attorneys; Timothy P. Beck, on the brief).

Robert F. Renaud argued the cause for respondent Township of Parsippany-Troy Hills (Palumbo Renaud & DeAppolonio, LLC, attorneys; Robert F. Renaud and Fotini Cassotis, on the brief).

Ronald D. Coleman argued the cause for respondents Aurora Information Security & Risk, LLC and Matthew Ferrante (Mandelbaum Salsburg, PC, attorneys; Ronald D. Coleman, on the brief).

The opinion of the court was delivered by

HOFFMAN, J.A.D.

Plaintiff James Carifi, a former captain in the Parsippany-Troy Hills Police Department (the PD), alleges he was forced to retire involuntarily in April 2013. During the last four years of his employment, plaintiff faced multiple internal affairs (IA) investigations, including allegations of engaging in electioneering

A-0597-17T1

on behalf of his brother while on-duty and using a PD-issued computer for personal reasons.

In 2014, plaintiff filed a Law Division complaint, alleging that defendants initiated the multiple IA investigations against him in retaliation for his brother's political activities.[1] In his suit, plaintiff asserted breach of contract, various tort-based claims, and a claim for a Computer-Related Offenses Act[2] (CROA) violation. On August 28, 2017, the Law Division granted dismissal motions filed by each defendant, after determining plaintiff's complaint failed to state a claim upon which relief could be granted. On October 9, 2017, plaintiff filed this appeal. Finding no basis to disturb the dismissal orders under review, we affirm.

---

[1] The matter under review, (Carifi III), was the third of three lawsuits involving plaintiff and the Township of Parsippany-Troy Hills (the Township). In Carifi v. Township of Parsippany-Troy Hills, No. A-2356-17 (Carifi I), a suit filed in October 2011, plaintiff alleged statutory, constitutional, and tort-based claims, including a violation of the Conscientious Employee Protection Act (CEPA). Carifi I concluded in a no-cause jury verdict in October 2017 and plaintiff appealed. In a separate opinion issued simultaneously with this opinion, we vacate the dismissal of plaintiff's case against the Township in Carifi I and remand for a new trial. In Carifi II, filed in October 2013, the Township sued plaintiff for breach of contract, Township of Parsippany-Troy Hills v. Carifi, No. MRS-L-2604-13; in that suit, the Township alleged plaintiff wrongfully refused to repay the tuition for his graduate degree, after he did not remain employed as an officer for two years. Carifi II settled before trial.

[2] N.J.S.A. 2A:38A-1 to -6.

A-0597-17T1

I.

On December 26, 2014, plaintiff filed his initial complaint, alleging tortious conduct against the Township and four other defendants: then-Mayor James R. Barberio; then-solicitor John P. Inglesino; then-Police Chief Paul Philipps; and Aurora Information Security and Risk, LLC (Aurora).[3]  On June 4, 2015, plaintiff filed a first amended complaint against the same defendants.[4]

On June 10, 2016, the motion court heard and decided motions to dismiss filed by Mayor Barberio, Mr. Inglesino, Chief Philipps, and Aurora.  The motion court granted the motions, in part, dismissing counts two, three, four, five, and six without prejudice, and dismissing counts seven, eight, nine, ten, twelve, and

---

[3]  Mayor Barberio remained in office until 2017.  Chief Philipps retired in 2018.

[4]  This pleading alleged a breach of contract claim against the Township only (count one); in addition, it asserted counts against the other four defendants: tortious interference with contracts (count two); tortious interference with prospective economic advantage (count three); defamation (count four); a violation of N.J.S.A. 2A:38A-3, computer tampering causing damage (count five); future earning capacity damaged by injury to professional reputation through defamation and tortious release of confidential information (count six); violation of New Jersey state doctrine of fundamental fairness in protecting citizens against unjust and arbitrary governmental action (count seven); breach of public trust in discharging duties in violation of the public good (count eight); breach of public official's fiduciary duty (count nine); malicious misrepresentation causing harm (count ten); conspiracy to commit tortious acts (count eleven); violation of N.J.S.A. 2C:41-2, Racketeering (count twelve); conspiracy to violate N.J.S.A. 2C:41-2 (count thirteen).

A-0597-17T1

thirteen with prejudice. The court denied the motions as to count four and did not rule on count eleven, permitting plaintiff to replead the count. The court granted plaintiff leave to file an amended pleading within thirty days.

On July 8, 2016, plaintiff filed a second amended complaint. In this pleading, plaintiff named the same defendants as the first amended complaint, and added, without leave, two more defendants, Matthew Ferrante (a principal of Aurora) and the Law Firm of Inglesino, Webster, Wyciskala & Taylor (The Inglesino Firm). He alleged a breach of contract claim against the Township (count one); in addition, he alleged the following claims against the remaining defendants: tortious interference with contracts (count two); tortious interference with prospective economic advantage (count three); a violation of CROA, (count four); and conspiracy to commit tortious acts (count five).

In August and September 2016, all defendants filed motions to dismiss plaintiff's second amended complaint. On August 27, 2017, following oral argument, the motion court dismissed plaintiff's second amended complaint in its entirety for failure to state a claim. On August 28, 2017, the court entered a confirming order, dismissing plaintiff's second amended complaint with prejudice.

5

On October 9, 2017, plaintiff filed this appeal. Since plaintiff appeals from the orders that granted defendants' motions to dismiss, pursuant to Rule 4:6-2(e), we set forth in section II the relevant factual allegations contained in plaintiff's 406-paragraph second amended complaint.[5]

II.

Plaintiff's career as a police officer began when he joined the Parsippany PD in 1992.[6] In January 2009, when he held the rank of lieutenant, plaintiff was assigned to the PD's Planning and Research Section of the Support Services Division. In May 2009, Captain Edward Jasiecki became plaintiff's superior.

On September 2, 2009, Captain Jasiecki lodged an IA complaint against plaintiff, alleging criminal official misconduct, under N.J.S.A. 2C:30-2. The filing of this IA complaint marked the first of multiple (IA) investigations

---

[5] On a motion to dismiss pursuant to Rule 4:6-2(e), the court must treat all factual allegations as true and must carefully examine those allegations "to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim[.]" Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)(quoting Di Cristofaro v. Laurel Grove Mem'l Park, 43 NJ. Super. 244, 252 (App. Div. 1957)).

[6] When asked about his first involvement in the IA process after joining the Parsippany PD in 1992, plaintiff recounted, "I was a witness against fellow officers who had assaulted a juvenile and I testified truthfully against them."

A-0597-17T1

directed at plaintiff. Those investigations would later serve as the basis of the CEPA claim plaintiff asserted when he filed suit in <u>Carifi I</u> on October 24, 2011.

In 2012, Paul Carifi, Jr. (plaintiff's brother) decided to run against Mayor Barberio in the next primary election. Because of concerns that plaintiff's brother could win, Mayor Barberio and Mr. Inglesino caused the Parsippany PD to commence an IA investigation into whether plaintiff used the PD's Citizen Police Academy (CPA) program for political purposes, including assisting plaintiff's brother in his political efforts. As a result of the IA investigation, plaintiff suffered injury to his reputation, "good name," and "exemplary record."

As part of this IA investigation, defendants distributed a "confidential" questionnaire to Parsippany residents asking about plaintiff's conduct during CPA meetings. One citizen gave the document to plaintiff at a CPA graduation ceremony, because the citizen thought that the questionnaire concerned plaintiff. The IA investigation did not yield credible evidence that plaintiff used CPA meetings for political purposes.

On November 12, 2012, Mayor Barberio met plaintiff's brother for lunch to discuss the brother's political plans. Plaintiff's brother told Mayor Barberio that he remained undecided about running for mayor against him in 2013. Mayor Barberio told plaintiff's brother that if he ran for sheriff instead of mayor,

A-0597-17T1

Mayor Barberio and Mr. Inglesino would support him to ensure that he won that election. After this meeting, Mayor Barberio told plaintiff's brother that if he ran for mayor, then he and Mr. Inglesino would use their "significant power, control, and authority over Parsippany to cause injury and damage" to plaintiff.

On January 13, 2013, Mayor Barberio and Mr. Inglesino invited Louis Valori to the Township's town hall for a meeting at 8 p.m. on a Sunday evening with then-council president Brian Stanton. During this meeting, Mr. Inglesino and Mayor Barberio offered Mr. Valori a "no-show job" that paid $50,000 per year if he agreed not to support plaintiff's brother for mayor.

On January 14, 2013, plaintiff's brother announced his intention to run in the Republican mayoral primary election. On February 7, 2013, Mr. Valori announced his intention to run for council on the same ticket as plaintiff's brother.

In February 2013, Mayor Barberio, Mr. Inglesino, and The Inglesino Firm retained Aurora to search five PD computers, including plaintiff's computer. On February 11, 2013, then-Police Chief Anthony DeZenzo and then-Deputy Chief Philipps seized plaintiff's work computer. Through the imaging and searching of plaintiff's computer, Aurora accessed plaintiff's "private, personal documents, photographs, data, and information," in addition to plaintiff's IA records.

Plaintiff's computer was returned for his use after the search of the hard drive was completed.

On February 21, 2013, the Township and plaintiff participated in a court-ordered mediation in the Carifi I case. During that mediation session, Mayor Barberio and Mr. Inglesino offered plaintiff a promotion to deputy chief if he dropped the lawsuit and convinced his brother to abandon his bid for mayor. If he did not accept this offer, Mayor Barberio and Mr. Inglesino communicated to plaintiff that they "would cause inappropriate, unlawful materials and/or information to be planted on the hard drive of" plaintiff's work computer.

On March 4, 2013, Aurora accessed the PD's computer network to search and copy plaintiff's network share, including his emails. It also accessed his computer on March 12, 2013.

On March 15, 2013, plaintiff submitted written notice of his intention to retire, effective April 1, 2013, which he described as "involuntary." When he retired on April 1, 2013, plaintiff was in "good standing."

On March 25, 2013, Mr. Inglesino provided Chief Philipps (he became chief earlier that month) with documents obtained from plaintiff's work computer by the Aurora defendants. Based on these documents, Chief Philipps filed an IA complaint, IA 2013-11, alleging that plaintiff "used [PD] time and

equipment to conduct personal business and disclosed confidential police information." Plaintiff received notification of this administrative complaint on March 27, 2013. On the same date, PD Captain Rich Pantina provided the Morris County Prosecutor's Office (MCPO) with documents obtained from plaintiff's work computer. On April 8, 2013, after finding no evidence of criminal activity, the MCPO returned the IA complaint to the PD for administrative investigation. Chief Philipps purportedly received the letter from the MCPO on April 11, 2013, but delayed acknowledgement and disclosure of the letter until after the election.

On April 15, 2013, after plaintiff retired, Mr. Inglesino directed Aurora to seize plaintiff's computer again. Aurora issued a final report of its investigation of plaintiff on September 9, 2013, concluding that plaintiff accessed the PD's "network(s), computer system and confidential data" and that he "knowingly, willingly, intentionally and without authorization . . . exceed[ed] his authorization by moving, deleting and/or permanently destroying [the PD's] property and confidential information." It further stated that the PD's "computer systems and computer data, as well as the integrity of such computer systems and computer data have been permanently manipulated and damaged" by plaintiff's activities.

10

The report stated that forensic evidence showed plaintiff was "responsible for very high volumes of data deletion, linked to unauthorized removable flash storage device insertions in order to move confidential information to unsecure and unauthorized media[,] putting fellow officers, the public and personally identifiable information, and PD information at significant risk."

On December 24, 2014, Chief Philipps caused plaintiff to be served with disciplinary charges for IA 2013-11. Thereafter, Mr. Inglesino designated Joseph Devine, the retired police chief of Rockaway Township, as the hearing officer for the charges against plaintiff. Chief Devine held a hearing in summer 2015, and determined that disciplinary charges could not be pursued against plaintiff. Consequently, in December 2015, the Township formally withdrew the disciplinary charges initially served upon plaintiff in December 2014.

Applicable Guidelines Identified by Plaintiff

Defendants violated specific guidelines and protocols during the investigation of IA 2013-11, including the Internal Affairs Policy and Procedures (IAPP)[7] of the Police Management Manual. These guidelines

---

[7] N.J.S.A. 40A:14-181 required all law enforcement agencies in the state to adopt and implement guidelines consistent with the guidelines governing the IAPP. "Section 181 effectively made the [Attorney General's] IAPP required policy for all municipal law enforcement agencies in New Jersey." Fraternal
(continued)

A-0597-17T1

require IA complaints to be investigated by a county prosecutor or an IA investigator, and designate the investigations as confidential. Only law enforcement personnel may access documents and information concerning IA investigation actors. When a search of a computer is involved, a critical question is whether the employee had a reasonable expectation of privacy regarding the information on the computer.

Department Computer Practices

The Parsippany PD allowed officers to use PD-issued computers for various personal reasons and searches. The PD also permitted some officers to bring their personal computers into the department for work-related tasks, and issued portable storage devices, such as flash drives, to officers without any guidelines for their use.

Township police officers routinely moved, copied, and deleted information on their computers without seeking permission from the Township Administrator, and plaintiff saw "numerous occasions" where officers deleted information when their computer was assigned to a new officer. As a result, plaintiff used his work computer to download and store personal information,

---

Ord. of Police, Newark Lodge No. 12 v. City of Newark, 244 N.J. 75, 101 (2020).

send and receive personal emails, conduct schoolwork, and other "personal and private activities."

Because plaintiff also had "periodic involvement" with IA investigations as an investigator or by supervising an investigation, his computer could not be accessed by non-law-enforcement personnel or unauthorized law department personnel. Aurora did not have a search warrant for plaintiff's work computer.

The PD's IA unit also implemented its own policies and procedures for internal investigations. Those policies provided that IA investigations were confidential; in addition, they did not grant explicit authority to the Township attorney to hire outside investigators to assist with internal investigations.

Dissemination of Non-Public Information

On April 30, 2013, NJ.com published an online article that reported non-public information about plaintiff, after the reporter spoke with Mr. Inglesino, who disclosed that non-public information. Plaintiff did not specify what constituted this "non-public information." Mayor Barberio and Mr. Inglesino also distributed political campaign leaflets in May 2013 and May 2015, that disclosed non-public information about plaintiff that also caused injury to plaintiff. Plaintiff did not describe that information.

A-0597-17T1

In December 2013, attorneys from The Inglesino Firm "engaged in substantial communications," specifically eighty hours of communication, with the MCPO and disclosed non-public information about plaintiff.

Additionally, Mayor Barberio and Mr. Inglesino caused one or more attorneys from The Inglesino Firm to communicate with a reporter from The Daily Record in July 2014, telling the reporter the prosecutor was "on the verge of indicting" plaintiff with "one or more crimes arising from the alleged workplace copying and deletion of electronically stored information."

Denial of Benefits

Stephen Trimboli, an attorney working as co-counsel with Mr. Inglesino and The Inglesino Firm, represented to the Pension Review Board that plaintiff's retirement prevented the PD from conducting its IA investigation and that plaintiff should, therefore, be barred from receiving his benefits and pension.

Plaintiff's employment contract entitled him to receive $368,482.02 upon his retirement, representing $325,382.14 for unused personal, sick, and vacation days, and $43,099.88 for 488.5 hours of unused compensatory time. Plaintiff did not receive this payment, although the Township Council approved it and included it in the Township's annual budget. The Council also approved

14

payment of plaintiff's attorney's fees and costs incurred in defending the criminal and disciplinary charges against him, which he also did not receive.

Plaintiff was entitled to holiday pay for working Good Friday in 2013. Plaintiff contacted the Township's chief financial officer (CFO) about the unpaid holiday pay, and the CFO stated that Mr. Inglesino told him not to pay plaintiff.

Firearm Documents

After plaintiff retired, he sought employment that required possession of a Firearms Identification Card, Carrying Permit, and related documents. However, Mayor Barberio, Mr. Inglesino, and Chief Philipps caused the PD to issue a letter dated August 7, 2014, stating that plaintiff's application for a firearms identification card should be denied because it was "not in the best interest of public health, safety, and welfare" for plaintiff to possess the card.

Plaintiff challenged the refusal of the firearms identification card in Morris County Superior Court in November 2014. At the hearing, Chief Philipps testified that the PD had no lawful reason to withhold plaintiff's firearms documentation and that attorneys working under Mr. Inglesino's direction instructed him to withhold the documentation. The very next month, Chief Philipps, Mayor Barberio, and Mr. Inglesino sought to interfere with plaintiff's application for other firearms documents. On March 12, 2015, Morris

County Superior Court held another hearing to address plaintiff's challenge to the denial of the other firearms documentation. Chief Philipps did not appear but swore under oath that plaintiff retired in "good standing."

Tuition Reimbursement

The Township paid tuition and school costs for plaintiff that totaled $16,427.18, within two years prior to plaintiff's retirement. The Township, therefore, brought a claim against plaintiff for breach of contract and sought reimbursement. The "relevant contract" required an officer who obtained a degree higher than a Bachelor's degree to work a minimum of two years beyond his degree date, and if he does not do so, then the officer would need to reimburse the Township for the costs of that degree.

When plaintiff earned the degree at issue, two other officers also earned that degree, Det. Sgt. Richard Nicoletti and Sgt. Robert Whiteman. Det. Sgt. Nicoletti retired in December 2012, and Sgt. Whiteman retired in December 2013. The Township did not seek reimbursement from either officer.

### III.

We use a de novo standard of review to review the dismissal of a complaint for failure to state a claim under Rule 4:6-2(e). Donato v. Moldow, 374 N.J. Super. 475, 483 (App. Div. 2005). We focus our inquiry on "the legal

16

sufficiency of the facts alleged on the face of the complaint." Printing Mart, 116 N.J. at 746. Thus, we "search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim," and give plaintiff an opportunity to amend if necessary. Ibid. (quoting Di Cristofaro, 43 N.J. Super. at 252).

We do not determine the plaintiff's ability to prove the complaint's allegations at this stage in litigation, and "plaintiffs are entitled to every reasonable inference of fact." Ibid. Nevertheless, "a court must dismiss the plaintiff's complaint if it has failed to articulate a legal basis entitling plaintiff to relief." Sickles v. Cabot Corp., 379 N.J. Super. 100, 106 (App. Div. 2005).

Dismissal of Plaintiff's Contract-Based Claim

Plaintiff first contends the motion court erred in dismissing his breach of contract claim against the Township. This argument lacks merit.

The New Jersey Employer-Employee Relations Act[8] (EERA) provides that a "majority representative of public employees in an appropriate unit shall be entitled to act for and to negotiate agreements covering all employees in the unit[.]" N.J.S.A. 34:13A-5.3. It further states that "[w]hen an agreement is reached on the terms and conditions of employment, it shall be embodied in

---

[8] N.J.S.A. 34:13A-1 to -49.

 A-0597-17T1

writing and signed by the authorized representatives of the public employer and the majority representative." Ibid.

The EERA mandates that "collective agreements in the public sector include provisions for grievance procedures through which the employees may appeal 'the interpretation, application or violation of policies, agreements, and administrative decisions . . . affecting them.'" Troy v. Rutgers, 168 N.J. 354, 379 (2001) (alteration in original) (quoting N.J.S.A. 34:13A-5.3). Additionally, the grievance procedures established in the agreement "shall be utilized for any dispute covered by the terms of such agreement[,]" and the EERA explicitly permits binding arbitration. N.J.S.A. 34:13A-5.3. "Nevertheless, the question whether a particular dispute is arbitrable under the terms of the parties' contract is an issue to be decided by the courts." Troy, 168 N.J. at 379-80. The statute further provides that when "interpreting the meaning and extent of a provision of a collective negotiation agreement providing for grievance arbitration, a court or agency shall be bound by a presumption in favor of arbitration. Doubts as to the scope of an arbitration clause shall be resolved in favor of requiring arbitration." N.J.S.A. 34:13A-5.3.

In his pleadings, plaintiff specifically names only one contract that could have been breached, the Superior Officers Agreement (the SOA). On appeal,

plaintiff presents three arguments why the motion court erred when it dismissed his breach of contract claim:  1) the SOA did not apply to him; 2) its grievance procedure was ambiguous; and 3) the Township waived its right to arbitration.

We find plaintiff's arguments confusing because he pleaded in his complaint that the SOA did not apply to him, but acknowledged during oral argument before the motion court that the SOA did apply to him.  His reply brief states he is not appealing the motion court's ruling that a binding contract existed, but rather, he challenges whether the SOA constitutes the only contract between the parties and whether the SOA grievance procedure applies.

Plaintiff's breach of contract claim alleged the Township and plaintiff "were parties to one or more lawful agreements, each of which [was] supported by good and valuable consideration, and each of which constituted a binding and legally enforceable contract pursuant to which" plaintiff was entitled to the Township's "full and complete, good faith performance[.]"  Plaintiff further alleged he materially performed all duties under these contracts and the Township's "acts and omissions" excused him from any further performance.

Plaintiff additionally asserted the Township "breached both express and implied terms and covenants in its Contracts with [plaintiff], causing consequential injury and resulting damage which flowed and continue to flow

19

from the breaches"; specifically, that the Township had an "expressed obligation" to pay plaintiff his accrued but unused compensatory time, sick days, and vacation days. He further pleaded that his "Contracts with [the Township] each included an implied covenant of good faith and fair dealing," which the Township breached by committing "a host of wrongful acts and omissions."

In dismissing plaintiff's contract claim against the Township for failure to state a claim under Rule 4:6-2(e), the motion court found the SOA applied to plaintiff's claims, the provisions of the SOA and grievance procedure were not ambiguous, and the proper avenue for plaintiff's claims was the SOA's grievance procedure. The court noted that plaintiff's complaint failed to state what contract or expressed term the Township breached, and that plaintiff conceded that the SOA applied to him.

The SOA's preamble states that the agreement is between the Township and the Superior Officers Association (the Association), and that it "represents the complete and final understanding on all bargainable issues between the Township and the Association." Under Article I, the Township recognized the Association "as the sole and exclusive collective negotiation bargaining agent for all Superior Officers employed by the Parsippany-Troy Hills [PD], excluding the Chief and Patrolmen, clerical and craft employees and other employees."

Article XVII of the SOA contains a grievance procedure. Section B of this article defines "grievance" as "any controversy arising over the interpretation or application of the terms and conditions of this Agreement, including disciplinary action by management and promotion, and may be raised by the employee, or the Association, or the Township."

Section C of Article XVII identifies the SOA's grievance procedure as "the sole and exclusive method for resolving grievances between the parties if the grievant elects not to pursue his remedies under Title 11A, the Civil Service Act of the State of New Jersey." Section C further provides that an aggrieved employee must institute an action under its provisions within fifteen days of the "act of being grieved," and that failure to act within fifteen days "shall be considered an abandonment and waiver of the grievance." The SOA then establishes a four-step process that culminates in a decision by the mayor. An officer who disagrees with that decision may demand binding arbitration.

Article XXI of the SOA states that it "represents and incorporates the complete and final understanding and settlement by the parties on all bargainable issues and shall govern all wages, rights, and responsibilities of the parties which were or could have been the subject of negotiations." The

Association president signed the SOA on behalf of the Association, and the mayor and business administrator signed the SOA on behalf of the Township.

Applicable Contract

Plaintiff first asserts the motion court erred when it found that his complaint did not identify what contract the Township breached. He argues his complaint identified "a variety of contractual rights and interests arising from his long-term employment relationship with Parsippany," and that he "asserted that the source of his rights and interests included, but were not limited to, the [SOA], other understandings Parsippany and he shared in connection with their employment relationship, New Jersey Civil Service law, and New Jersey common law (such as implied covenant of good faith and fair dealing)."

To establish a breach of contract claim,

> Our law imposes on a plaintiff the burden to prove four elements: first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]."
>
> [Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (alterations in original) (quoting Model Jury Charges (Civil) § 4.10A "The Contract Claim-Generally" (approved May 1998)).]

22

The paragraphs in the complaint cited by plaintiff to support his argument that he pleaded "a variety of contractual rights," do not actually identify any contracts and, thus, fall short of establishing the required elements of a breach of contract claim. Rather, the complaint pleaded that the Township and plaintiff were "parties to one or more lawful agreements," but then failed to identify any such agreements. The motion court properly found that the SOA constituted the only contract between plaintiff and the Township.

Plaintiff argues that the Township acknowledged his contractual rights outside of the SOA when it filed its complaint in Carifi II and included a claim for material breach of the implied covenant of good faith and fair dealing against plaintiff. The basis for that claim in that separate case, now settled, was the SOA, which required plaintiff to work for two years following the completion of his graduate degree. The motion court correctly dismissed plaintiff's breach of contract claim against the Township for failure to state a claim.

Grievance Procedure

Plaintiff next argues the motion court erred in ruling that the SOA's alternative dispute resolution (ADR) provision precluded him from proceeding in court. Asserting the SOA contains an "ambiguous, unclear, [and] confusing" grievance procedure, plaintiff argues his failure to utilize it could not constitute

a waiver of his right to proceed in court. Because we reject the premise of this argument, we conclude it clearly lacks substantive merit.

The interpretation and construction of a contract is a matter of law; as a result, we review the motion court's decision de novo. Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009). In contractual disputes, "the language of the agreement typically governs," GMAC Mortgage, LLC v. Willoughby, 230 N.J. 172, 183 (2017), and "courts should enforce contracts as the parties intended," Pacifico v. Pacifico, 190 N.J. 258, 266 (2008). As such, "it is a basic rule of contractual interpretation that a court must discern and implement the common intention of the parties." Id. at 266.

The court determines whether the contract is clear or ambiguous. Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations[.]" Ibid. (alteration in original)(quoting Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997)). Additionally, when determining the meaning of the agreement's terms "by the objective manifestations of the parties' intent, the terms of the contract must be given their 'plain and ordinary meaning.'" Ibid. (quoting Nester, 301 N.J. Super. at 210). Courts should examine the document as a whole and "'not torture the language

[of a contract] to create ambiguity.'" Ibid. (alteration in original) (quoting Nester, 301 N.J. Super. at 210).

When a contract's terms are "clear and unambiguous[,] there is no room for interpretation or construction," and, therefore, courts "must enforce the terms as written." Karl's Sales & Serv., Inc. v. Gimbel Bros., 249 N.J. Super. 487, 493 (App. Div. 1991). Courts may not rewrite the contract, remake a better contract for the parties, or alter the contract to benefit one party. Schor, 357 N.J. Super. at 192. "The general rule is that an employee seeking to bring a contract grievance 'must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress.'" Thompson v. Joseph Cory Warehouses, Inc., 215 N.J. Super. 217, 220 (App. Div. 1987) (quoting Republic Steel Corp. v. Maddox, 379 U.S. 650, 652-53 (1965)).

In support of his attack on the wording of the ADR provision, plaintiff cites the SOA's use of the term "parties" as an example. He asserts that the "parties" are the Township and the Association, since the SOA does not include language incorporating individual officers or employees, and he did not personally sign it. For these reasons, plaintiff posits that the SOA's language stating that it is "the sole and exclusive method of resolving grievances between the parties" does not suggest that it binds him, because the language does not

state that it constitutes the sole procedure for disputes between the employer and any specifically identified employees.

Plaintiff additionally argues, that in paragraph B(1), the term "grievant" is used in conjunction with male pronouns, thus limiting the application of the ADR provision to male "grievants"; as a result, he asserts the language "indicat[es] that no one other than a male 'Officer' has the right to proceed" with the arbitration procedure.

We reject plaintiff's arguments that the grievance procedure set forth in the SOA is ambiguous, unclear, and confusing. We find plaintiff's arguments, including his contention that the use of male pronouns render the contract confusing because it means it does not apply to female officers, are attempts to "torture" the contract's language to create an ambiguity. Schor, 357 N.J. Super. at 191. "A basic principle of contract interpretation is to read the document as a whole in a fair and common sense manner." Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009). Here, a common sense reading of the SOA confirms that the contract and its terms are not ambiguous. It is reasonable that "employees" in a superior officer's agreement, although undefined in the SOA, refers to superior officers, and that the failure to use female pronouns does not mean the agreement does not apply to female superior officers.

Plaintiff's complaint seeks compensation for vacation days, sick days, and compensation time, and therefore, his claim clearly falls under the terms and conditions of the SOA, which addresses base salaries, hours and overtime, holidays and personal days, vacations, and other leave. Additionally, the SOA addresses retirement benefits in Article XVI. Because plaintiff's complaint pleaded a right to these benefits identified in the SOA, his claims fall within in the scope of the SOA. We flatly reject plaintiff's attempt to argue the SOA does not apply to him while seeking benefits provided in the SOA.

Moreover, plaintiff's argument that the SOA does not apply to him because he did not sign it clearly lacks merit. Although the SOA does not specifically include plaintiff's name, the Association represented plaintiff as a superior officer and it therefore applies to him. The motion court correctly rejected plaintiff's arguments that the Grievance Procedure in the SOA was "hopelessly flawed" and ambiguous.

Waiver

Finally, plaintiff asserts the Township waived its right to arbitration by engaging in litigation since 2011. Again, we disagree.

Arbitration agreements are contracts, "subject, in general, to the legal rules governing the construction of contracts." Cole v. Jersey City Med. Ctr.,

215 N.J. 265, 276 (2013) (quoting McKeeby v. Arthur, 7 N.J. 174, 181 (1951)).

As arbitration clauses may be modified or superseded, courts have "recognized that parties may waive their right to arbitrate in certain circumstances." Ibid. (citing Wein v. Morris, 194 N.J. 364, 376 (2008)). However, "[w]aiver is never presumed[,]" and an arbitration agreement "'can only be overcome by clear and convincing evidence that the party asserting it chose to seek relief in a different forum.'" Ibid. (quoting Spaeth v. Srinivasan, 403 N.J. Super. 508, 514 (App. Div. 2008)).

"The same principles govern waiver of a right to arbitrate as waiver of any other right." Ibid. As such, the waiving party "must have full knowledge of [its] legal rights and intent to surrender those rights." Ibid. (quoting Knorr v. Smeal, 178 N.J. 169, 177 (2003)). Waiver may be implicit if "the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference," and that waiver must be done "clearly, unequivocally, and decisively." Id. at 277 (quoting Knorr, 178 N.J. at 177).

Our Supreme Court has explained that "[a]ny assessment of whether a party to an arbitration agreement has waived that remedy must focus on the totality of the circumstances[,]" and it is a fact-sensitive analysis. Id. at 280. When discerning whether a party waived an arbitration agreement, the Court

28

stated courts should "concentrate on the party's litigation conduct to determine if it is consistent with its reserved right to arbitrate the dispute." Ibid.

Courts should consider the following factors when evaluating this issue:

> (1) the delay in making the arbitration request; (2) the filing of any motions, particularly dispositive motions and their outcome; (3) whether the delay in seeking arbitration was part of the party's litigation strategy; (4) the extent of discovery conducted; (5) whether the party raised the arbitration issue in its pleadings, particularly as an affirmative defense, or provided other notification of its intent to seek arbitration; (6) the proximity of the date on which the party sought arbitration to the date of trial; and (7) the resulting prejudice suffered by the other party, if any.
>
> [Id. at 280-81.]

Importantly, no one factor is dispositive. Id. at 281. However, if a party only asserts arbitration in its answer and does not take any other measures to preserve the affirmative defense, then a court will consider the arbitration agreement waived. Ibid. (citing Williams v. Bell Tel. Lab'ys Inc., 132 N.J. 109, 118-20 (1993); Fees v. Trow, 105 N.J. 330, 335 (1987)).

Plaintiff argues the Township has been engaged in litigation with plaintiff since 2011, starting with Carifi I, yet the Township never sought to obtain relief or dismissal of Carifi I based on the arbitration clause in the SOA. We reject this argument as the claims plaintiff asserted in Carifi I did not arise under the

29

"terms and conditions" of the SOA – like the compensation claims asserted by plaintiff in this case – but rather were statutory claims.

The Township filed Carifi II in October 2013, alleging a breach of contract, tort, and a statutory claim under CROA. The Township's complaint in that case did assert a count for breach of contract, arising out of the SOA and plaintiff's refusal to repay his tuition for his graduate degree after he did not remain employed as an officer for two years after receiving that degree, pursuant to the SOA. Plaintiff filed a motion for leave to file a counterclaim and third-party complaint in that action, and the Township filed a letter brief objecting to plaintiff's motion, in part because the counterclaims against the Township would be barred by the SOA. That case settled in November 2017, before trial.

In this matter, Carifi III, the Township pleaded affirmative defenses in its answer to plaintiff's first amended complaint in 2015, stating that plaintiff's claims were subject to the exclusive remedy of the grievance procedure set forth in the SOA, and also that the action was barred by the EERA. Although the assertion of affirmative defenses alone is insufficient, the Township also filed the motion to dismiss under review in September 2016.

Plaintiff does not cite any authority to support his argument that separate litigation between parties outside of the present case waives an ADR provision.

A-0597-17T1

Regardless, we reject the argument that the two other actions involving these parties waived the Township's right to invoke the ADR provision in this case, as the claims in one case arose outside the scope of the SOA and the other case settled. Plaintiff does not proffer he suffered prejudice and no trial date had been set. Considering these factors, the motion court did not err in concluding the Township did not waive its right to arbitrate in this case.

Dismissal of Plaintiff's Tort-Based Claims

Plaintiff argues the motion court erred when it dismissed his claims asserting tortious interference with contract, tortious interference with prospective economic advantage, and conspiracy to commit tortious acts, claims he pled against all defendants, except for the Township. We disagree.

The motion court dismissed count two for tortious interference with contracts against Aurora, Mayor Barberio, Mr. Ferrante, Mr. Inglesino, and The Inglesino Firm, concluding that plaintiff's complaint failed to identify any contract of plaintiff where these defendants could be found to have interfered.

The motion court also concluded the Tort Claims Act[9] (TCA) barred plaintiff's tort claims against Mayor Barberio, Mr. Inglesino, and The Inglesino Firm. The court found that plaintiff's allegations stemmed from their public

_____

[9] N.J.S.A. 59:1-1 to 12-3.

employment and that the alleged misconduct occurred in the capacity of defendants roles as public employees. The court explained that it was in defendants' roles as mayor and Township attorney that they committed the alleged torts against plaintiff for allegedly political reasons, and, thus, there was "a nexus between the wrong complained of and defendant[s'] employment." The court accordingly dismissed counts two, three, and five with prejudice for failure to serve timely notice under the TCA.

The TCA "reestablished the rule of immunity for public entities and public employees, with certain limited exceptions." Marcinczyk v. State of N.J. Police Training Comm'n, 203 N.J. 586, 595 (2010). As the statute abrogates sovereign immunity, "the [TCA] is strictly construed to permit lawsuits only where specifically delineated." Gerber ex rel. Gerber v. Springfield Bd. of Educ., 328 N.J. Super. 24, 34 (App. Div. 2000). Moreover, the statute provides that a "public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J.S.A. 59:2-10. The TCA additionally provides that "[n]othing in [the TCA] shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct." N.J.S.A. 59:3-14(a).

When the statute permits a lawsuit against a public entity or public employee, the claim must be brought against the public entity or public employee in accordance with the procedure set forth in the statute. N.J.S.A. 59:8-3. That procedure requires that a claimant give notice to the public entity no later than ninety days after the accrual of the cause of action. N.J.S.A. 59:8-8. After six months from the date the notice of the claim is received, the claimant may file suit with the appropriate court. Ibid. The TCA further provides that a claimant is "forever barred" from recovering against the public entity or public employee if the claimant does not file notice with the public entity within the ninety days, two years have elapsed since the accrual of the claim, or the claimant entered into a settlement with respect to the claim. Ibid.

Our Supreme Court has also held that although the TCA provides that a public employee is not immune if his or her conduct constituted a crime, actual fraud, actual malice, or willful misconduct, "that provision must be read together with the overall mandate of N.J.S.A. 59:8-3," requiring adherence to the prescribed procedure that requires notice. Velez v. City of Jersey City, 180 N.J. 284, 294 (2004). Claimants must provide notice to public entities and its employees even if they assert intentional torts. Ibid. Accordingly, the motion

court correctly dismissed counts two, three, and five with prejudice for failure to serve timely notice under the TCA.

## Claims Not Before This Court

As an initial matter, we note that plaintiff presents arguments in support of his tort-based and CROA claims against Chief Philipps, Mr. Ferrante, The Inglesino Firm, Mayor Barberio, Aurora, and Mr. Inglesino; however, plaintiff's second amended complaint pleaded only one count against Chief Philipps, a CROA claim contained in count four. Plaintiff's notice of appeal indicated he is only appealing the August 28, 2018 orders, which dismissed with prejudice plaintiff's CROA claim against Chief Philipps. Therefore, we do not consider any TCA arguments asserted in plaintiff's brief that refer to Chief Philipps.

Additionally, citing Rule 4:9-1, the motion court dismissed the claims against The Inglesino Firm because plaintiff failed to file a motion to amend his pleadings to add the firm as a party. Plaintiff added The Inglesino Firm as a party when he filed his second amended complaint but did not name The Inglesino Firm or Mr. Ferrante as parties in his original complaint or first amended complaint. The motion court rejected plaintiff's argument that he did not need leave to amend his complaint since the court dismissed his pleading without prejudice and did not limit the scope of the refiling. The motion court

34

explained that the transcript of the June 10, 2016 proceedings indicates the court allowed plaintiff to replead the counts that were deficient, not add new parties. Regardless, the motion court found that an amendment to add The Inglesino Firm would be futile because the firm acted as the Township's attorney at the direction of the Township Council, rendering any claims against it subject to the TCA.

The motion court similarly ruled that plaintiff's addition of Mr. Ferrante as a defendant was improper because of plaintiff's failure to file a motion to amend his pleadings.[10]  Plaintiff addresses his addition of Mr. Ferrante in a footnote of his brief.  We are not obligated to address this point.  See Almog v. Israel Travel Advisory Serv., Inc., 298 N.J. Super. 145, 155 (App. Div. 1997) (stating that courts will not "countenance the raising of additional legal issues" in footnotes and "need not respond to oblique hints and assertions made" within them).  Nevertheless, plaintiff argues that even though the court did not grant him leave to add Mr. Ferrante, he named Mr. Ferrante "throughout the various iterations of the complaints" he previously filed, fully describing Mr. Ferrante's

---

[10]  The motion court in its discussion did not explicitly reference Mr. Ferrante; however, as plaintiff added Mr. Ferrante to his second amended complaint for the first time in the same filing that added The Inglesino Firm, it follows that the same reasoning applies to Mr. Ferrante.

role in this case. As a result, plaintiff posits there was no surprise or unfairness in his unauthorized addition of Mr. Ferrante as a party. Plaintiff offers no authority to support his position except for the guidance of Rule 4:9-1, that leave of court to amend pleadings "shall be freely given in the interest of justice." Here, however, plaintiff did not request leave from the court, so such relief could not be granted "freely," or at all.

Accordingly, this court considers plaintiff's TCA arguments only as they relate to Mayor Barberio, Mr. Inglesino, and Aurora, as addressed next, and the CROA arguments only as they relate to Mayor Barberio, Mr. Inglesino, Aurora, and Chief Philipps, as addressed later in this opinion.

## Tort Claims Act

Plaintiff argues that notice to the Township was not required by the TCA because he only asserted intentional tort claims against public employees, and not against the public entity. He asserts the TCA does not require notice to the public entity when a plaintiff sues a public employee for an intentional tort or for conduct outside the scope of his or her employment. We disagree.

The motion court explained that "plaintiff's allegation in his complaint against Mayor Barberio, Mr. Inglesino, and The Inglesino Firm all stem from their public employment and how [they] allegedly used their position to wrong"

plaintiff. The court found that the "alleged misconduct occurred pursuant to each of the above defendant's roles as public employees," and that it was in "the role of Mayor and [T]ownship attorney that these defendants allegedly committed these torts against [p]laintiff for allegedly political reasons." Therefore, the court concluded that, there was "a nexus between the wrong complained of and [plaintiff's] employment," and accordingly dismissed counts two, three, and five with prejudice for failure to serve timely notice under the TCA. Noting that the goals of the notice "are important," and that the requirements of the notice are "simple," the court held it would "not allow [p]laintiff to circumvent the relatively simple notice requirement and important goals it serves."

In support of his argument that the TCA did not apply to the non-Township defendants, plaintiff cites Gazzillo v. Grieb, 398 N.J. Super. 259, 260 (App. Div. 2008). In that case, we held that the plaintiff could bring suit against the defendant, who was an employee of the board of education, despite the plaintiff not filing a TCA notice of tort claim. Id. at 261-62. The defendant had pled guilty to sexually assaulting the plaintiff in the related criminal case and the plaintiff did not name the school board as a defendant in her civil case. Id. at 262. We held, in part, that notice was not required because the record

37

disclosed that it was "purely accidental that plaintiff was assaulted on school grounds." Id. at 264. The court reasoned that if notice in this instance needed to be filed for any claim against a public employee, then "it would follow that if the assault had occurred at a nearby shopping mall, plaintiff would still be required to file a notice of claim." Ibid. Accordingly, the court held that "there must be some nexus between the wrong that is complained of and the defendant's public employment in order to mandate that a notice of claim be filed before suit may be instituted." Ibid.

The court distinguished the case from other cases that required notice because the other cases arose from the "public nature of the individual defendants," and in Gazzillo, the only connection between the employee's misconduct and his public employment was that the assault occurred on school premises. Id. at 264. We considered it "significant" that the plaintiff in that case did not make any claim against the public entity, but rather sought recovery only from her assailant. Id. at 263. Plaintiff here cites this language to argue that the trial court improperly dismissed his tort claims against Mayor Barberio, Mr. Inglesino, and Chief Philipps. The critical issue here, then, is whether there was a connection between the employment of these individuals and their alleged misconduct.

The TCA defines "employee" to include "an officer, employee, or servant, whether or not compensated or part-time, who is authorized to perform any act or service; provided, however, that the term does not include an independent contractor." N.J.S.A. 59:1-3. "It has long been recognized that control by the master over the servant is the essence of the master-servant relationship on which the doctrine of respondeat superior is based." N.J. Prop.-Liab. Ins. Guar. Ass'n v. State, 195 N.J. Super. 4, 8 (App. Div. 1984)(emphasis omitted). This "control test," provides that this master-servant relationship exists "whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or in other words, not only what shall be done, but how it shall be done." Wright v. State, 169 N.J. 422, 436-37 (2001) (quoting N.J. Prop.-Liab. Ins., 195 N.J. Super. at 8). On the other hand, an independent contractor has "an independent business, contracts to do a piece of work according to his own methods, and [is not] subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work." N.J. Prop.-Liab. Ins., 195 N.J. Super. at 8-9 (citation omitted).

"The first factor to explore under the control test is 'the degree of control exercised by the employer over the means by which the task is accomplished.'"

<u>Wright</u>, 169 N.J. at 437 (quoting <u>Delbridge v. Off. of Pub. Def.</u>, 238 N.J. Super. 288, 320 (Law Div. 1989)).  "Furthermore, '[a]mong the factors our courts have considered is to infer an employer's right of control over an employee (aside from direct evidence of control) are method of payment[,] who furnishes the equipment, and right of termination.'"  <u>Ibid.</u> (alterations in original) (quoting <u>N.J. Prop.-Liab. Ins.</u>, 195 N.J. Super. at 14).

If a person is found to be an employee under the control test, then the inquiry ends there.  <u>Gil v. Clara Maass Med. Ctr.</u>, 450 N.J. Super. 368, 381 (App. Div. 2017).  However, if that test is inconclusive, courts should apply the "relative nature of the work test," which "calls for an examination of 'the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business.'"  <u>Ibid.</u> (citation omitted).  This test "may provide a more accurate assessment of the working relationship" when that relationship "involves professional services where an employer cannot exercise control over the methods used to provide those services[.]"  <u>Ibid.</u> (quoting <u>Lowe v. Zarghami</u>, 158 N.J. 606, 618 (1997)).

Here, there is a nexus between the public employment and the alleged misconduct.  Plaintiff alleged a public official conspired with another public employee to begin an IA investigation through the Township PD against

plaintiff, yet another public employee. Further illustrating the nexus between the public employment of these defendants and the asserted tort claims, plaintiff alleged that Mayor Barberio, Mr. Inglesino, and Chief Philipps interfered with contracts related to his public employment and that their conduct forced him into retirement. These allegations were not occurrences that simply occurred on Township property, as in Gazzillo. 398 N.J. Super. at 264.

Moreover, plaintiff's own allegations in his complaint draw the connection between the individual defendants' public employment, the Township itself, and defendants' alleged wrongdoings. For example, in paragraph 339 of his second amended complaint, plaintiff pleaded:

> Parsippany permitted its Mayor (Defendant Barberio), its Township Attorney (Defendant Inglesino), its Chief of Police (Defendant [Philipps]), and its retained agents (Defendants Aurora and Ferrante); Defendant [law firm] and attorney Trimboli, to wage an unprecedented, unending, vicious, campaign to destroy Mr. Carifi; destroy his good name and reputation; render him insolvent and/or on the brink of insolvency; and forever ruin his chances of obtaining meaningful private sector and/or public sector employment.

The allegations in the complaint repeatedly link the actions of Mr. Inglesino and The Inglesino Firm with Mayor Barberio. The complaint asserts that the Township "permitted" Mr. Inglesino, The Inglesino Firm, and Mayor Barberio

41

to commit harmful acts directed at plaintiff – these allegations sufficiently establish their role as Township employees requiring notice under the TCA.

Plaintiff further argues that The Inglesino Firm, Mr. Ferrante, and Aurora were not entitled to immunity since they were retained by Mr. Inglesino and not the Township. He also asserts that derivative immunity is not available to contractors who engage in intentional conduct, and that Mr. Inglesino, The Inglesino Firm, Aurora, and Mr. Ferrante's conduct "involved legal services and unlicensed private investigator services."

Although independent contractors are expressly excluded from immunity under the TCA, independent contractors "do, under well-recognized principles, share to a limited extent, the immunity of public entities with whom they contract." Vanchieri v. N.J. Sports & Exposition Auth., 104 N.J. 80, 85 (1986). Our Supreme Court has held that when "a public entity provides plans and specifications to an independent contractor, the public contractor will not be held liable for work performed in accordance with those plans and specifications." Id. at 86. The reasoning for this is that "the immunity of the entity itself would become meaningless if contractors complying with its design were liable in tort for defects in that design[,]" and that if contractors "never shared government immunity, their costs of doing business would be higher and

those higher costs would be passed on to the government entities hiring the contractors." Ibid.

In this case, Mr. Inglesino, the Township attorney, retained Aurora to assist in an IA investigation of plaintiff conducted by the Township PD. As part of that IA investigation, it gathered information from plaintiff's work computer, as directed by Township employees involved in that investigation. These are the type of circumstances the Court has identified as warranting extended immunity to contractors enacting the public entity's plans. Ibid. The motion court did not err in dismissing the tort claims against Aurora, Mayor Barberio, and Mr. Inglesino as barred by the TCA.

Tortious Interference with Contract

Plaintiff argues the trial court erred when it dismissed plaintiff's tortious interference of contract claim because the complaint alleged that Mayor Barberio, Mr. Inglesino, The Inglesino Firm, and Aurora interfered with his contractual rights and economic advantages. We disagree.

In his complaint, plaintiff alleged the non-Township defendants interfered with his following purported contract rights: 1) his "right to continued employment" with the Township PD, "rather than be forced involuntary into retirement"; 2) his right to payments owed under the "Contracts"; and 3) his

43

"contractual right to being treated lawfully and fairly by Parsippany during his employment with" the Township PD. This included the "right not to be subjected to improper and unlawful employment-based searches and seizures" and "improper, irregular, and/or unlawful internal affairs investigations."

To establish a claim for tortious interference with contractual relations, a plaintiff must prove four elements: "(1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage." Dello Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003). This claim must be based, in part, on "facts claiming that the interference was done intentionally and with 'malice.'" Ibid. (quoting Printing Mart, 116 N.J. at 751). "For purposes of this tort, [t]he term malice is not used in the literal sense requiring ill will toward plaintiff," but instead is "defined to mean that the harm was inflicted intentionally and without justification or excuse." Ibid. (alterations in original) (quoting Printing Mart, 116 N.J. at 751).

A defendant's interference with a contract "is intentional 'if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.'" Ibid. (quoting

44

Restatement (Second) of Torts § 766A, cmt. e (Am. Law Inst. 1977)). "An individual acts with malice when he or she intentionally commits a wrong without excuse or justification." Ibid. (quoting Cox v. Simon, 278 N.J. Super. 419, 433 (App. Div. 1995)). A party acting to "advance [its] own interest and financial position," however, fails to establish the required malice or wrongful conduct." Ibid. (alteration in original) (quoting Sandler v. Lawn-A-Mat Chem. & Equip. Corp. 141 N.J. Super. 437, 451-52 (App. Div. 1976)).

Here, the motion court found that the complaint "fail[ed] to identify any contract that was allegedly interfered with by the firm or the individuals working at the direction of the firm as Township Counsel and/or the Township." The court reasoned that "there could be no tortious interference as a matter of law as the firm is working for the [T]ownship – at least according to the allegation in the complaint, the other contracting party." The court further rejected plaintiff's argument that Mayor Barberio, Mr. Inglesino, and The Inglesino Firm were working outside the scope of their employment, and consequently not working for a contracting party. Rather, the court again found that plaintiff's claim was barred by the TCA and his failure to file the requisite tort claim notice.

Plaintiff further contends the motion court erred in specific findings it made as to Aurora regarding its intentional interference with prospective

economic advantage and conspiracy claims. The court separately found that plaintiff's claim of tortious interference with prospective economic advantage (count three) failed against Mr. Ferrante and Aurora.

Protection from interference of contract is "not limited to contracts already made[,]" but the law also protects one's "interest in reasonable expectations of economic advantage." Harris v. Perl, 41 N.J. 455, 462 (1964). Our Supreme Court has set forth the elements of tortious interference with a prospective contractual relationship claim:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.
>
> [Nostrame v. Santiago, 213 N.J. 109, 122 (2013) (quoting Restatement (Second) of Torts § 766 (Am. Law. Inst. 1979)).]

"There must be proof not only of the unlawful, intentional interference with the prospect of reasonable expectation of economic advantage, but also proof that if there had been no interference there was a reasonable probability

46

that the victim of the interference would have received the anticipated economic benefits." Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173, 185-86 (App. Div. 1978). The complaint must also allege that the injury caused damage. Norwood Easthill Assocs. v. Norwood Easthill Watch, 222 N.J. Super. 378, 384 (App. Div. 1988).

Courts balance factors to evaluate whether an act of interference was improper. Nostrame, 213 N.J. at 122. "Those considerations include an evaluation of the nature of and motive behind the conduct, the interests advanced and interfered with, societal interests that bear on the rights of each party, the proximate relationship between the conduct and the interference, and the relationship between the parties." Ibid. Further, "it is essential in any action based on tortious interference with economic advantage that such interference be malicious," meaning "'the intentional commission of wrongful act without justification or excuse.'" Kopp, Inc. v. United Techs., Inc., 223 N.J. Super. 548, 559 (App. Div. 1988) (quoting Levin v. Kuhn Loeb & Co., 174 N.J. Super. 560, 573 (App. Div. 1980)).

Here, the motion court found plaintiff did not sufficiently plead an act of malice. Accordingly, it dismissed the count against Mr. Ferrante and Aurora with prejudice.

A-0597-17T1

Plaintiff argues that the trial court erred in dismissing this count because he sufficiently pleaded "malice" in his complaint. He asserts that Mr. Ferrante and Aurora did not have a legal right, authority, or justification to "invade [plaintiff's] protected police computer and inspect its contents" because it contained IA information that was not accessible by other officers. He argues the complaint stated Aurora and Mr. Ferrante furthered their own interests by billing the Township hundreds of thousands of dollars in false and inflated billing. In support of that assertion, plaintiff notes that in December 2014, Judge Honigfeld denied that the Township was entitled to be compensated for $183,000 charged to it by Aurora for work related to two discovery motions. Plaintiff further asserts that he pleaded malice because Aurora and Mr. Ferrante authored and published reports that were "intentionally false and misleading," as proven by plaintiff's computer forensic expert.

Plaintiff relies on DiMaria Constr., Inc. v. Interarch, 351 N.J. Super. 558, 556 (App. Div. 2001), to support his arguments that Aurora defendants acted with malice and in pursuit of their own interests. In DiMaria, a general contractor brought an action for tortious interference with a contract against an interior designer and architect of a construction project, and a jury found in favor of the plaintiff. Id. at 562. While the defendants were agents of the bank with

whom the plaintiff contracted, the defendants acted outside the scope of their agency with malice and in bad faith when they dismissed the plaintiff.  Id. at 572.   Although the jury never had the opportunity to directly consider the defendants' motivation to fire the plaintiff, it was implicit in the jury's verdict that the defendants acted "in their own personal interest when they recommended firing[the plaintiff]," because the project had been delayed due to the defendants' abnormal number of changes and poor quality of draft plans.  Id. at 570, 573.

Here, plaintiff identifies paragraph 81 of his complaint as "unambiguously stating that Aurora and Mr. Ferrante furthered their own interests through unlawful conduct and billing Parsippany hundreds of thousands of dollars in false and inflated billing."   However, plaintiff's complaint fails to establish malice, as it does not demonstrate that Aurora acted outside of its agency, even if it may have reaped some financial reward.  See id. at 568 (stating "a clear-cut consensus has emerged that if an employee or agent is acting on behalf of his or her employer or principal, then no action for tortious interference will lie.").

Moreover, the paragraphs in plaintiff's complaint which he cites as showing "actual malice" contain allegations that contradict his arguments that Aurora and Mr. Ferrante acted outside the scope of employment and for their

own personal interests. For example, plaintiff cites to paragraphs that state Mayor Barberio, individually and/or on behalf of the Township, and Mr. Inglesino, individually and/or on behalf of The Inglesino Firm, directed Aurora to seize and search the police computers; that Mayor Barberio and Mr. Inglesino had the "right, power, and authority, to supervise and control the scope, means, and methods of the tasks being performed by Aurora and/or [Mr.] Ferrante"; and that they accessed the computers "as agents of defendants [Mayor] Barberio and [Mr.] Inglesino who" could supervise and control Aurora and Mr. Ferrante. Those allegations show administrative connection as agents between the Aurora defendants and the Township. We conclude the motion court correctly dismissed count three as to Aurora.

Plaintiff further contends the motion court erred when it dismissed with prejudice the conspiracy claim he asserted against Aurora and Mr. Ferrante. We disagree.

A civil conspiracy is defined as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means[.]" Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005) (quoting Morgan v. Union Cty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993)). The principal element of a civil conspiracy is the parties'

agreement "to inflict a wrong against or injury upon another, and an overt act that results in damage." Ibid. (quoting Morgan, 268 N.J. Super. at 364). "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." Ibid. (alteration in original)(quoting Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988)). "An unwitting party may not be liable under a conspiracy theory[,]" and "[c]ivil conspirators are jointly liable for the underlying wrong and resulting damages." Id. at 178.

Additionally, a corporation acting "through authorized agents and employees . . . cannot conspire with itself." Tynan v. Gen. Motors Corp., 248 N.J. Super. 654, 668 (App. Div. 1991), rev'd in part, 127 N.J. 269 (1992).

The motion court reasoned that the second amended complaint "did not contain any allegations that Aurora or [Mr.] Ferrante entered an agreement or [that] there was a meeting of the minds to a conspiracy." The court dismissed the claim as to Mr. Ferrante and Aurora based on the TCA.

Plaintiff argues that count five was improperly dismissed because his complaint alleged that Aurora, which Mr. Ferrante controlled, entered into an agreement with The Inglesino Firm to access and search plaintiff's police computer for "possible private political activities; conduct an unlawful private

investigation of [plaintiff]; and collect from Parsippany hundred-upon-hundreds of thousands of dollars in false and/or inflated charges for service." He claims the law does not require Aurora or Mr. Ferrante to know the nature of the criminality of the acts and omissions made in furtherance of a conspiracy, nor does it require plaintiff to plead that Aurora or Mr. Ferrante agreed to or had a meeting-of-the-minds as to a plan that they knew to be criminal.

However, plaintiff's arguments fail because Mr. Ferrante was not permissibly added as a party and Aurora is not liable for this tort under the TCA as an independent contractor entitled to derivative immunity where plaintiff did not comply with the notice provision of the TCA, as previously noted. Even if Aurora were not entitled to derivative immunity under the TCA, the motion court properly found that there was no meeting of the minds required to form a conspiracy. The allegations in plaintiff's complaint demonstrate that the Aurora defendants were retained by Mr. Inglesino to conduct imaging of plaintiff's computer. We conclude the motion court correctly dismissed plaintiff's conspiracy claim.

## Computer Related Offenses Act

Plaintiff argues that the motion court improperly dismissed his CROA claim, contending he adequately pleaded that he sustained damage to his

property and that he had a reasonable expectation of privacy to his workplace computer. We disagree.

Plaintiff pleaded that defendants violated N.J.S.A. 2A:38A-3, a section of the CROA, which provides that a "person or enterprise damaged in business or property" resulting from specified actions, including "unauthorized accessing" any computer, may "recover compensatory and punitive damages and the cost of the suit[.]" CROA defines "'property" as including "but is not limited to financial instrument, information, data, and computer software in either human or readable or computer readable form, copies or originals, and any other tangible or intangible item of value." N.J.S.A. 2A:38A-1(k).

Plaintiff asserts his allegations that his name, reputation, contractual rights, interests, and economic advantages were damaged, fall under the statute's definition of "property" because the definition includes "any tangible or intangible items of value." He argues the statute contains nothing to suggest that "property" excludes his good name, reputation, contractual rights, and/or economic advantages." We are satisfied the motion court correctly concluded that a plain reading of the statute's definition does not include the terms that plaintiff identified as property.

A-0597-17T1

In addition, we note that while plaintiff summarily pleaded that he experienced these damages, he did not plead how he was damaged. Here, defendants accessed the data on plaintiff's work computer as part of an IA investigation. Plaintiff's pleadings did not set forth any facts that would show defendants used that data in such a way to benefit themselves or specifically harm plaintiff. Therefore, we conclude the motion court properly dismissed the CROA claim because plaintiff did not plead that he sustained damage in business or property, as required by the statute.

In addition to failing to plead damage to property as defined by the statute, plaintiff's claim fails because he did not plead that defendants were unauthorized to access his computer, as required by the statute. N.J.S.A. 2A:38A-3. Plaintiff asserts that the trial court erred in finding that he had no reasonable expectation of privacy to his work computer. We disagree.

An element of a CROA claim requires "unauthorized" action. N.J.S.A. 2A:38A-3. When a government employer's warrantless search is "conducted for a 'noninvestigatory, work-related purpos[e]' or for the 'investigatio[n] of work-related misconduct,'" the search is "reasonable if it is 'justified at its inception' and if 'the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of' the circumstances giving rise to the

54

search." City of Ontario, Cal. v. Quon, 560 U.S. 746, 761 (2010) (quoting O'Connor v. Ortega, 480 U.S. 709, 725-26 (1987)).

Moreover, we have held that an employee had no reasonable expectation of privacy in the personal information that he stored in his workplace computer. State v. M.A., 402 N.J. Super. 353, 369 (App. Div. 2008). In that case, the employer owned the computers, stored the computers in the company office, advised the employee that the computers were company property, and the tower containing business software was connected to the company's network system. Ibid. Additionally, the employer had equal access to the computers and the employee's private office was never closed or locked. Ibid. We reasoned that even though the employee used a confidential password, the expectation of privacy was still unreasonable because "a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered." Ibid. (quoting Rakas v. Illinois, 439 U.S. 128, 143 n.12 (2014)); see also Doe v. XYC Corp., 382 N.J. Super. 122, 138-39 (App. Div. 2005) (finding no legitimate expectation of privacy when an employee used a company computer to access adult and child pornography websites).

Here, the motion court rejected plaintiff's assertion that he had a high expectation of privacy in the computer based on the guidelines and protocols

included in the Police Management Manual. The court concluded that the search of plaintiff's computer was reasonable and plaintiff had no expectation of privacy, and, therefore, he failed to plead a violation of the statute. The court reasoned that if an officer is the subject of an IA investigation, then it was reasonable to believe that his computer could be searched. Accordingly, it dismissed count four with prejudice as to all parties.

In this case, plaintiff's second amended complaint repeatedly refers to the computer as issued or owned by the Township PD. For example, the complaint refers to purported instances that defendants seized and searched "the PTHPD-issued computer used by James Carifi," "Mr. Carifi's PTHPD-issued office computer," "at least five PTHPD computers and/or computer hard drives," "Mr. Carifi's PTHPD computer hard drive," "Mr. Carifi's data, documents, and information he stored on his PTHPD-issued computer." Plaintiff alleges that defendants accessed his "private, personal documents, photographs, data, and information, as well as [his] confidential internal affairs records pertinent to his activities at PTHPD," through his police department-issued computer emails and/or network share.

Even though he pleads that he used his own password to log onto his computer, that fact is not dispositive. See M.A., 402 N.J. Super. at 369 (finding

an employee had no reasonable expectation of privacy to his company's computer even though he used a confidential password). As reasoned by the motion court, if an officer is under investigation, it is not reasonable to believe that his government-owned computer cannot be searched. Quon, 560 U.S. at 761; see also State v. Hemenway, 239 N.J. 111, 128-29 (2019) (quoting Ortega, 480 U.S. at 721) (stating the public interest doctrine had been "extended to certain public employer work-related searches given the 'realities of the workplace, which strongly suggest that a warrant requirement would be unworkable.'"). We conclude the motion court correctly dismissed plaintiff's CROA claim because he failed to plead that defendants were not authorized to access his work-issued computer.

Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0597-17T1